

**ORIGINAL**

1
**POLSINELLI LLP**
Todd M. Malynn (CA Bar No. 181595)
2
Adam P. Daniels (CA Bar No. 296466)
2049 Century Park East, Suite 2900
3
Los Angeles, CA 90067
Telephone: 310.556.1801
4
Facsimile:   310.556.1802
Email:        tmalynn@polsinelli.com
5

*Attorneys for Plaintiffs*
6
HAND & NAIL HARMONY, INC.,
NAIL ALLIANCE, LLC
7

8
# IN THE UNITED STATES DISTRICT COURT
9
# FOR THE CENTRAL DISTRICT OF CALIFORNIA
10

11
HAND & NAIL HARMONY, INC., a
12
California corporation, NAIL
ALLIANCE, LLC, a Delaware
13
corporation,

14
               Plaintiffs,
   v.
15

16
ABC NAIL AND SPA PRODUCTS, a
California business; GEL NAIL
17
SUPPLY, a California business; VAL
USA MANUFACTURER, INC. (a.k.a.,
18
Val Gel Polish Manufacture), a
California corporation; VIP NAIL
19
PRODUCT, INC., a California
corporation; V&V BEAUTY SUPPLIES,
20
a California business; NAIL LOUNGE
LLC, a Nevada business; TODAY NAIL
21
(a.k.a., Nails Today), a Nevada business;
HOLLYWOOD BEAUTY SUPPLY, a
22
Nevada business; MT BEAUTY
SUPPLY, a South Carolina business;
23
NAIL MARK'S, a Florida business;
A&A NAIL SUPPLY, a Nebraska
24
business; XUAN THI LAM; CHAU THI
NGOC LE; ANH Q. LE; IRIS ZHEN;
25
FELIX TSENG; CINDY TRINH;
LINDSIDE PHÂM; BRYAN TRAN;
26
HAI T. NGUYEN; BAO TOAN LE; and
DOES 1 through 100, inclusive,

27
               Defendants.

28

Case No. SACV 16-00969 DOC (JEMx)

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF RENEWED *EX PARTE* APPLICATION FOR: (A) ENTRY OF TEMPORARY RESTRAINING ORDER; (B) ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION; AND (C) EXPEDITED DISCOVERY**

**FILED UNDER SEAL PURSUANT TO 15 U.S.C. § 1116 (d)(8)**

[Filed concurrently with Ex Parte Application, Supplemental Declaration of GariDawn Tingler, Declaration of Sunil Sirdesai, Declaration of Todd M. Malynn, and Proposed Order]

Polsinelli LLP
2049 Century Park East, Suite 2300
Los Angeles, CA 90067
310.556.1801

53307388.7

# **TABLE OF CONTENTS**

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ............................................1

I.   INTRODUCTION ................................................................................1

II.  STATEMENT OF FACTS...................................................................2

    A.   Harmony's GELISH Brand Products....................................2

    B.   Defendants' Counterfeiting Operations ................................4

III. THE COURT SHOULD ISSUE AN INJUNCTION PROTECTING HARMONY'S BRAND FROM COUNTERFEITING ACTIVITY.............................................7

    A.   There Is a Substantial Likelihood That Plaintiffs Will Prevail That Defendants Are Infringing the GELISH Marks...................................................................................8

    B.   Plaintiffs Are Suffering A Likelihood of Irreparable Injury..................................................................................14

    C.   The Injury to Plaintiffs Outweighs Potential Harm to Defendants...........................................................................18

    D.   The Public Interest Is Best Served By Enjoining Defendants' Counterfeiting........................................19

IV.  A MULTI-DISTRICT OR EXTRATERRITORIAL INJUNCTION IS NECESSARY AND PROPER ...............19

    A.   Consumers and Plaintiffs Are Entitled To Broad Injunctive Relief to Protect Against Continued Counterfeiting .......................................................19

    B.   Defendants Will Have A Full and Fair Opportunity To Be Heard ..........................................................21

V.   BOND AMOUNT .............................................................................21

VI.  THE REQUESTED INJUNCTIVE RELIEF IS NECESSARY AND APPROPRIATE .............................................22

1

## **TABLE OF CONTENTS**

**Page**

VII.   PLAINTIFFS SHOULD BE ALLOWED TO ENGAGE IN
       EXPEDITED DISCOVERY ................................................................23

VIII.  CONCLUSION .................................................................................24

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abercrombie & Fitch Co. v. Moose Creek, Inc.,*
486 F.3d 629 (9th Cir. 2007) ...............................................................8

*Alliance for the Wild Rockies v. Cottrell,*
632 F.3d 1127 (9th Cir. 2011) .............................................................8

*Am. Trucking Ass'n, Inc. v. City of Los Angeles,*
559 F.3d 1046 (9th Cir. 2009) .............................................................8

*American Bullion, Inc. v. Regal Assets, LLC,*
2014 WL 7404597 (C.D. Cal. Dec. 30, 2014) ...................................16

*AMF Inc. v. Sleekcraft Boats,*
599 F.2d 341 (9th Cir. 1979): (1) ........................... 10, 12, 13, 14

*Anderson v. United States,*
612 F.2d 1112 (9th Cir.1979) ............................................................23

*Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.,*
174 F.3d 1036 (9th Cir. 1999) ...........................................8, 9, 10, 13

*Cadence Design Sys., Inc. v. Avant! Corp.,*
125 F.3d 824 (9th Cir. 1997) ...............................................................8

*Chanel, Inc. v. Puka Creations, et al.,*
Case No. 14-cv-08405-ODQ (C.D. Cal. Nov. 3, 2014) ........15, 16, 17

*In Re Countrywide Fin. Corp Derivative Litig.,*
542 F. Supp. 2d 1160 (C.D. Cal. Mar. 28, 2008) ..............................24

*CytoSport, Inc. v. Vital Pharmaceuticals, Inc.,*
617 F. Supp. 2d 1051 (E.D. Cal. 2009) .......................................14, 15

*Dreamwerks Prod. Group v. SKG Studio,*
142 F.3d 1127 (9th Cir. 1998) ...........................................................10

*E. & J. Gallo Winery v. Gallo Cattle Co.,*
967 F.2d 1280 (9th Cir. 1992) .....................................................12, 13

*E. & J. Gallo Winery v. Grenade Bev. LLC,*
2014 WL 4073241 (E.D. Cal. Aug. 15, 2014).................................14

*Fiji Water Co., LLC v. Fiji Mineral Water USA, LLC,*
741 F. Supp. 2d 1165 (C.D. Cal. 2010) .............................................15

*Fitspot Ventures v. Bier,*
2015 WL 5145513 (C.D. Cal. Sep. 1, 2015) .....................................16

*FreecycleSunnyvale v. Freecycle Network,*
626 F. 3d 509 (9th Cir. 2010) ............................................................17

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*GoTo.com, Inc. v. Walt Disney, Co.,*
202 F. 3d 1199,1208 (9th Cir. 2000) .........................................1, 8

*Herb Reed Enterprises, LLC v. Florida Entertainment Mgt., Inc.,*
736 F.3d 1239 (9th Cir. 2013) .........................................8, 14, 16, 17

*Kerr Corp. v. Tri Dental, Inc.,*
2013 WL 990532 (C.D. Cal. Mar. 11, 2013).........................................17

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH &Co.,*
571 F.3d 873 (9th Cir. 2009) .........................................23

*Mattel, Inc. v. MCA Records, Inc.,*
296 F.3d 894 (9th Cir. 2002) .........................................20

*Maxim Integrated Products, Inc. v. Quintana,*
654 F. Supp. 2d 1024 (N.D. Cal. 2009).........................................15

*Montres Rolex, S.A. v. Snyder,*
718 F.2d 524 (2d Cir.1983).........................................9

*Network Automation, Inc. v. Advanced Sys. Concepts, Inc.,*
638 F.3d 1137 (9th Cir. 2011) .........................................11, 14, 16

*New Name, Inc. v. The Walt Disney Co.,*
No. CV 07–5034 PA, 2008 WL 5587486 (C.D. Cal. July 25, 2008).................20

*Nintendo of America, Inc. v. Lewis Galoob Toys, Inc.,*
16 F.3d 1032 (9th Cir. 1994) .........................................22

*Nintendo of America v. NTDEC,*
822 F. Supp. 1462 (D. Ariz. 1993) .........................................20

*Ocean Garden v. Marktrade Co. Inc.,*
953 F.2d 500 (9th Cir. 1991) .........................................20

*Official Airline Guides, Inc. v. Goss,*
6 F.3d 1385 (9th Cir. 1993) .........................................12

*Pacific Telesis v. International Telesis Comms.,*
994 F.2d 1364 (9th Cir.1993).........................................12

*Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Trust,*
636 F.3d 1150 (9th Cir. 2011) .........................................23

*Phillip Morris USA Inc. v. Shalabi,*
352 F. Supp. 2d 1067 (C.D. Cal. 2004) .........................................9, 10

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*QS Wholesale, Inc. v. Rox Volleyball, Inc.*,
  2015 U.S. Dist. LEXIS 95767 (C.D. Cal. Jul. 19, 2015)....................................15

*Reebok Int'l, Ltd. v. Marnatech Enterprises, Inc.*,
  970 F.2d 552 (9th Cir. 1992) ...........................................................................22

*Regal Knitwear Co. v. National Labor Relations Board*,
  324 U.S. 9 (1945)..............................................................................................20

*Seed Services, Inc. v. Winsor Grain, Inc.*,
  868 F. Supp. 2d 998 (E.D. Cal. 2012) ..............................................................15

*Sega Enterprises Ltd. v. Accolade, Inc.*,
  977 F.2d 1510 (9th Cir. 1992), *as amended* (Jan. 6, 1993) ..............................19

*Sierra On-Line, Inc. v. Phoenix Software, Inc.*,
  739 F.2d 1415 (9th Cir. 1984) ..........................................................................22

*Stanley v. Univ. of S. Cal.*,
  13 F.3d 1313 (9th Cir. 1994) ............................................................................23

*Starbucks Corp. v. Heller*,
  2014 WL 6685662 (C.D. Cal. Nov. 26, 2014) ............................................15, 17

*Stuhlbarg Int'l Sales Co. v. John D. Brushy & Co.*,
  240 F.3d 832 (9th Cir. 2001) .....................................................................7, 8, 18

*Textile Unlimited, Inc. v. A. BMH & Co.*,
  240 F.3d 781 (9th Cir. 2001) ............................................................................22

*Two Pesos, Inc. v. Taco Cabana, Inc.*,
  505 U.S. 763, 112 S. Ct. 2753, 120 L. Ed. 2d 615 (1992)...........................10, 11

*UMG Recordings, Inc. v. Doe*,
  2008 WL 4104214 (N.D. Cal. 2008) .................................................................24

*United States v. 10,510 Packaged Computer Towers, More or Less*,
  152 F. Supp. 2d 1189 (N.D. Cal. 2001) .........................................................9, 10

*Waffenschmidt v. Mackay*,
  763 F.2d 711 (1985)......................................................................................20, 21

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)............................................................................................7, 8

*Yash Raj Films (USA), Inc. v. Sidhu*,
  Case No. 09-cv-0233-AWI, 2010 WL 1032792 (E.D. Cal. Mar. 18,
  2010) .................................................................................................................22

v

# TABLE OF AUTHORITIES

**Page(s)**

**Statutes & Rules**

15 U.S.C. § 1114 ...........................................................................................9, 14

15 U.S.C. § 1115 ...................................................................................................9

15 U.S.C. § 1116 .........................................................................................19, 22

15 U.S.C. § 1125 ...................................................................................................4

15 U.S.C. § 1127 ...................................................................................................9

Fed. R. Civ. P. 26(f) ...........................................................................................24

Fed. R. Civ. P. 30 ...............................................................................................24

Fed. R. Civ. P. 65(d) ....................................................................................19-21

Restatement of Torts, § 729, Cmt. (b) (1938)....................................................12

MEMORANDUM OF POINT AND AUTHORITIES ISO TRO, ETC.

53307388.7

Polsinelli LLP
2049 Century Park East, Suite 2300
Los Angeles, CA 90067
310.556.1801

# MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiffs Hand & Nail Harmony, Inc. ("Harmony") and Nail Alliance, LLC ("Nail Alliance") (collectively, "Plaintiffs") respectfully submit this Memorandum in support of their renewed *Ex Parte* Application for (a) temporary restraining order ("TRO"); (b) order to show cause ("OSC") re: preliminary injunction and entry of a preliminary injunction; and (c) order for expedited discovery.

## I.   INTRODUCTION.

By this renewed application, Plaintiffs seek immediate relief against defendants ABC Nail & Spa Products, Gel Nail Supply, Val USA Manufacturer, Inc., VIP Nail Products, Inc., V & V Beauty Supplies, Xuan Thi Lam, Chau Thi Ngoc Le, Anh Q. Le, Iris Zhen, Felix Tseng, Cindy Trinh, Lindside Pham, Bryan Tran, Hai T. Nguyen, Bao Toan Le, Does 1 to 100, and all other persons with actual notice of the requested TRO who are in active concert or participation with them (collectively, "Defendants").[1]   Defendants are part of a multistate network of distributors and supply stores dumping cheap, low-quality, and potentially harmful foundation and top coat in the United States by counterfeiting a leading brand, and falsely representing to consumers that the product is "Made in U.S.A."

Plaintiffs are serving this application along with a summons, complaint, cover letter and supporting documents notifying Defendants of this action and how to respond thereto, and will promptly file proofs of services.[2]   As supported by the Supplemental Declaration of GariDawn Tingler ("Supp. Tingler Decl."), Declaration of Sunil Sirdesai, PhD ("Sirdesai Decl."), and Declaration of Todd M. Malynn ("Malynn Decl."), along with the previously filed papers, Plaintiffs respectfully request that the Court grant the requested relief.

---

[1]   Pursuant to the Court's order dated May 31, 2016 (Dkt. 14), Plaintiffs are in the process of amending their complaint to support the exercise of personal jurisdiction over defendants Nail Lounge LLC, Today Nail, Hollywood Beauty Supply, MT Beauty Supply, Nail Mark's III, Inc., and A&A Nail Supply, among others.

[2]   Malynn Decl. ¶ 3 & Exhibit ("Ex.") "1."

## II.   STATEMENT OF FACTS.

### A.   Harmony's GELISH Brand Products.

Harmony manufactures, promotes, distributes and sells an enormously successful line of gel polish, foundation and top coat under the brand name GELISH. GELISH brand products are of exceedingly high quality, durability, consistency and beauty. Declaration of GariDawn Tingler ("Tingler Decl.") ¶¶ 2-8 (Dkt. 8). GELISH brand foundation, gel polish, and top coat are sold in elegantly adorned and distinctive bottles as illustrated in Figure 1 below. *Id.* ¶ 9.



**FIGURE 1: GELISH FOUNDATION, GEL POLISH AND TOP COAT**

Plaintiffs' principal, Danny Haile, invented the first brush-on, soak-off gel polish, which is sold under the federally registered trademark name "GELISH". Tingler Decl. *Id.* ¶ 29. GELISH brand gel polish has the benefits of both a traditional nail polish (vibrant colors and a brush on application and finish) and a hard gel (long lasting wear). *Id.* ¶ 9. GELISH brand foundation, which is relatively expensive,[3] is used before a polish is applied; GELISH brand top coat is used after a polish is applied on a consumer's nails for a desired look. *Id.* ¶ 11.

GELISH brand products revolutionized the nail industry. Prior to the introduction of GELISH brand products, consumers generally went to salons for pampering or professional treatment, rather than for application of nail polish,

---

[3]   *See* Sirdesai Decl. ¶ 6.

1   which they could apply at home.  Further, because nail polish only lasts a few days

2   before chipping or cracking, it is relatively expensive for consumers to frequent a

3   salon just for nail polish.  Moreover, although salons offered alternative and longer

4   lasting products such as acrylics or hard-gels, consumers generally preferred the

5   natural look of such conventional nail polish.   This practical reality was an

6   impediment to salon business.  Tingler Decl. ¶ 3.

7        GELISH brand products provided salons a new product to sell as part of their

8   service.  By frequenting salons, consumers could now obtain the natural, nail-polish

9   look *but in a finish that would last three to four weeks.*  *Id.* ¶ 4.[4]   GELISH

10  substantially increased salon business and has been a tremendous commercial

11  success.  Plaintiffs have sold millions of bottles of their GELISH band gel polish,

12  foundation and top coat in the United States and around the world.  *Id.*

13       Consumers recognize GELISH brand goods by their distinctive trademarks

14  and trade dresses of their bottles, and routinely ask for it by name.  Tingler Decl.

15  ¶ 4.  Harmony has invested millions of dollars in promoting its GELISH goods,

16  marks and bottles in the United States and throughout the world.  Among other

17  things, Harmony has spent millions of dollars promoting GELISH brand goods at

18  trade shows and in an ever growing number of trade publications.  *Id.* ¶ 15.

19  Harmony   developed   and   maintains   a   highly   visited   website

20  (www.nailharmony.com) and corporate pages on social media sites, such as

21  Facebook, which link to popular advertisements, including a video that has been

22  viewed by well more than 2.5 million visitors.  *Id.* ¶ 16.

23       Nail Alliance is a holding company that owns the rights to United States

24  Trademark Registration Nos. 4,096,115 (GELISH standard character mark) and

25  3,857,946 (GELISH design plus words), as well as the unique three-dimensional

26  configuration and scrollwork pattern, which is protected by United States

27  _____
    [4]   GELISH Foundation, alone, is designed and tested to last at least twenty days.
28  Sirdesai Decl. ¶ 6.

Trademark Registration Nos. 4,473,557 and 4,473,558, together with other common law trademark rights associated with the GELISH goods, including the trade dress of the GELISH brand bottle (collectively, "GELISH marks"). Tingler Decl. ¶ 5 & Ex. 1 (certificates of registration). Harmony is the exclusive, worldwide licensee of Nail Alliance as relates to the GELISH goods, marks and bottle. *Id.*

The GELISH goods incorporate the ® symbol to notify others that the mark GELISH is the subject of federal trademark registrations. Tingler Decl. ¶ 14. The GELISH marks, trade dress and bottle are symbols of Harmony's quality, reputation and goodwill and have never been abandoned. *Id.* They are instantly recognizable and associated exclusively with Plaintiffs in the United States and throughout the world by consumers. *Id.* Indeed, Plaintiffs submit that the GELISH marks are famous as defined in the Lanham Act, 15 U.S.C. § 1125(c).

## B.   **Defendants' Counterfeiting Operations**.

The commercial success of GELISH goods has attracted a sophisticated ring counterfeiters bent on syphoning Harmony's profits at the expense of Harmony and unwary consumers. Defendants sell cheap, low-quality foundation and top coat are imported from China, mislabeled and sold as GELISH brand foundation and top coat (the "counterfeit product"). *See* Supp. Tingler Decl. ¶¶ 7-10. Defendants' counterfeit product is presented in bottles that mimic the look of genuine GELISH goods, intentionally to deceive unwary consumers.[5] *Id.* ¶¶ 21 & 30. Figures 3-5, below, shows examples of counterfeit product sold or offered for sale by each of the Defendants at different establishments in Southern California:

---

[5]   For purposes of preliminary injunctive relief, there is no scienter requirement. *GoTo.com, Inc. v. Walt Disney, Co.*, 202 F. 3d 1199,1208 (9th Cir. 2000) (even if "Disney was as innocent as a fawn with *no* intent to copy or appropriate GoTo's logo, it would prove nothing since no such intent is necessary to demonstrate a likelihood of confusion. We need inquire no further into Disney's intent."). Nevertheless, given the deeply discounted prices that Defendants have sold, or solicited Plaintiffs' private investigator to buy, counterfeit products, Plaintiffs have every reason to believe that Defendants know they are selling, or offering to sell, counterfeit product in fake GELISH bottles. *See* Tingler Decl. ¶¶ 24-30.

53307388.7



**FIGURE 3:  COUNTERFEIT BASE AND TOP COAT**



**FIGURE 4: GENUINE GELISH FOUNDATION (LEFT) NEXT TO
EXAMPLE COUNTERFEIT PRODUCT (RIGHT)**



**FIGURE 5: GENUINE GELISH TOP IT OFF (LEFT) NEXT TO EXAMPLE
COUNTERFEIT PRODUCT (RIGHT)**

MEMORANDUM OF POINT AND AUTHORITIES ISO TRO, ETC.

53307388.7

Given the near identical label of the counterfeit products and genuine GELISH brand products, it is undeniable that consumers presented with the counterfeit product will be confused regarding its source and origin. Worse, because the counterfeit product is of far inferior quality, its dissemination is harming and potentially ruinous to Plaintiffs' goodwill and reputation. *See* Tingler Decl. ¶¶ 34-40; Supp. Tingler Decl. ¶¶ 11-16; Sirdesai Decl. 4-8, Ex. 2.

On May 13, 2016, for example, after purchasing 10 bottles of counterfeit foundation for $10.20 each (~60% discount from the wholesale price of genuine GELISH foundation), a nail technician complained about the poor quality of the "GELISH" brand product as it ruined one of her client's nails. *Id* ¶ 25 (the nails "all fall off"). She complained that, unlike other foundations, the "GELISH" brand foundation "seems like it was thinned out with a gel polish thinner." *Id.* Upon opening a counterfeit bottle, one is immediately assailed by a foul gasoline/burnt plastic smell, which is an indication that the ingredients are not cosmetic grade and risk potential harm to consumers, particularly to a consumer's skin if a nail technician is not careful in application. Supp. Tingler Decl. ¶ 11.

Similarly, on June 2, 2016, Harmony had contact with a salon owner in Beverly Hills who had purchased counterfeit foundation at a deeply discounted price on EBay. After receiving complaints that the product was "brittle" and cracked within days, and "burned" one of his customers, he contacted Harmony. Harmony informed the owner that the product purchased off EBay was counterfeit and he should report it and get a refund. Supp. Tingler Decl. ¶ 15, Ex. 2.

These are not isolated incidents. In Orange County, Plaintiffs have located multiple distributors selling counterfeit product, including ABC Beauty, Gel Nail, VIP Nail, and V&V Beauty Supplies. *Id.* ¶ 16. Similarly, counterfeit product using the same fake labels has been found in three stores in Las Vegas, Nevada (Hollywood Beauty Supply, Nail Lounge, and Today Nail). *Id.* Counterfeit

MEMORANDUM OF POINT AND AUTHORITIES ISO TRO, ETC.
53307388.7

products have also been purchased or reportedly sold in supply stores in five other states (Missouri, Texas, Nebraska, South Carolina, and Florida). *Id.*

Plaintiffs have been informed that there is a common source for the counterfeit product from China, and master-type distributors, who are filling bottles or bringing counterfeit product in from Canada. *Id.* ¶¶ 9-10. The net result is that, in the first quarter of 2016, Harmony has experienced (a) an unexpected and substantial drop in sales of foundation and top coat,[6] (b) a loss of control over its leading brand, (c) a corresponding set of deceived and disappointed consumers who may never try the product again and who have been exposed to an undue risk of harm, and (d) disruption to their relationships with distributors resulting from the cheap, low-quality and mislabeled counterfeit product.[7]   *See* Tingler Decl. ¶¶ 34-40; Supp. Tingler Decl. ¶¶ 11-16; Sirdesai Decl. 4-7.  Given the nationwide scope of the counterfeiting activity, it is imperative that Plaintiffs stop the proliferation of the counterfeit product, have that product turned over and destroyed, and identify the source of the counterfeit goods and stop this network of wrongdoing.

## III.   THE COURT SHOULD ISSUE AN INJUNCTION PROTECTING HARMONY'S BRAND FROM COUNTERFEITING ACTIVITY.

The standards for issuing a TRO and a preliminary injunction are "substantially identical." *Stuhlbarg Int'l Sales Co. v. John D. Brushy & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001).  A preliminary injunction is an "extraordinary remedy." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  As

---

[6]   *See* Tingler Decl. ¶ 39 ($2 million).  On June 3, 2016, one of Harmony's master distributors met with one of its sub-distributors (Allure Nail Supply) in Kansas City, Missouri, to discuss a drop of $70,000 in sales mostly in the latter half of the first quarter of 2016, which the distributor complained was attributable in large part (more than 60%) to the counterfeiting activity.  Supp. Tingler Decl. ¶ 13.

[7]   It is hard to understate the risk of harm and the damage being done to Harmony's brand as a result of counterfeit product from China masquerading as "Made in USA."  Because of the proliferation of cheap, low-quality product from China, Sweden took the extreme step of banning a product, which had resulted in just "51 complaints from people who had experienced adverse effects from using the polish." Sirdesai Decl. ¶ 8, Ex. 2.

explained in *Winter*, a plaintiff seeking preliminary injunctive relief "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Am. Trucking Ass'n, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009).

After *Winter*, the Ninth Circuit re-affirmed that it adheres to a sliding scale of evidentiary proof on the first two elements, provided the minimal required showing of irreparable harm is met when there is a substantial likelihood of success on the merits. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). Moreover, there remains no requirement that a plaintiff must *suffer* irreparable harm to *prevent* irreparable harm from occurring. *Winter*, 555 U.S. at 22. Evidence of threatened loss of prospective customers or goodwill would plainly support a finding of irreparable harm. *Id.; Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush and Co., Inc.*, 240 F. 3d 832, 841 (9th Cir. 2001).

For over fifty years, when a plaintiff demonstrated a substantial likelihood of success in a trademark case, a corresponding likelihood of irreparable injury and entitlement to injunctive relief was presumed.[8] While the Ninth Circuit has pulled the reigns on a presumption of irreparable harm, "[e]vidence of loss of control over business reputation and damage to goodwill" is proof of irreparable harm. *Herb Reed Enterprises, LLC v. Florida Entertainment Management, Inc.*, 736 F.3d 1239, 1249 (9th Cir. 2013) ("*Herb Reed*") (citing *Stuhlburg*).

A. <u>**There Is a Substantial Likelihood That Plaintiffs Will Prevail That Defendants Are Infringing the GELISH Marks**</u>.

The intent of the Lanham Act is "to prevent fraud and deception . . . in commerce by the use of reproductions, copies, counterfeits, or colorable imitations

[8] *See Abercrombie & Fitch Co. v. Moose Creek, Inc.*, 486 F.3d 629, 633 (9th Cir. 2007); *GoTo.com, Inc.*, 202 F. 3d at 1205; *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036 (9th Cir. 1999); *Cadence Design Sys., Inc. v. Avant! Corp.*, 125 F.3d 824, 827 (9th Cir. 1997).

53307388.7

of registered marks." 15 U.S.C. § 1127. Accordingly, the Lanham Act expressly proscribes "use in commerce of any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods . . . on which such use is likely to cause confusion, or to cause mistake." 15 U.S.C. § 1114(a). To establish a trademark infringement claim, Plaintiffs must demonstrate that Defendants are using a trademark that is confusingly similar to Plaintiffs' valid, protectable trademark. *See Brookfield Communications*, 174 F.3d at 1046.

### 1.     The GELISH Marks Are Valid and Protectable.

A trademark registration on the principle register constitutes *prima facia* evidence of the validity of the mark. 15 U.S.C. § 1115. The GELISH marks are on the principle register, and thus are presumed valid. *See* Tingler Decl., Ex. 1.

### 2.     The Counterfeit Product Is Confusingly Similar.

Courts presume a likelihood of confusion in cases involving spurious marks and counterfeit goods. *Phillip Morris USA Inc. v. Shalabi*, 352 F. Supp. 2d 1067, 1073 (C.D. Cal. 2004) (counterfeit marks by their nature are inherently confusing). Section 45 of the Lanham Act defines a "counterfeit" as "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127. "[T]he inquiry into whether a mark is 'counterfeit' must be conducted 'from the standpoint of an average purchaser.'" *United States v. 10,510 Packaged Computer Towers, More or Less*, 152 F. Supp. 2d 1189, 1193 (N.D. Cal. 2001) (citing *Montres Rolex, S.A. v. Snyder*, 718 F.2d 524, 530–32 (2d Cir.1983)).

Here, as Figure 1 (which depicts authentic GELISH brand foundation and top coat) and Figures 2 through 5 (which depict images of the Counterfeit product solicited by and purchased from Defendants) plainly show, there is no question that Defendants' products incorporate spurious marks identical with or substantially indistinguishable from the GELISH marks. *See supra* at 5. Defendants are using

the identical GELISH marks, with the identical stylized font and capitalization, with very similar grey scrollwork highlights, over a white background, with the same color Foundation and Top it Off lettering on the front of the bottle. *Id.* Thus, with near certainty Plaintiffs will establish that Defendants are selling counterfeit goods as defined by the Lanham Act. Accordingly, since Defendants are selling counterfeit goods, a likelihood of confusion is presumed and this element of injunctive relief is satisfied. *Phillip Morris USA*, 352 F. Supp. 2d at 1073.

Even if it is not presumed, the conclusion of a likelihood of confusion is unavoidable. Under the traditional test for a likelihood of confusion, this Court assesses the eight factors identified in *AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341, 348 (9th Cir. 1979): (1) the degree of similarity between the conflicting marks; (2) relatedness or proximity of the two companies' products or services; (3) the strength of the Plaintiffs' mark; (4) marketing channels used; (5) the degree of care likely to be exercised by purchasers; (6) the intent of the alleged infringer in using the mark; (7) evidence of actual confusion; (8) likelihood of expansion into product lines. No one factor is dispositive. *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1054 (9th Cir. 1999). While some factors are more important than others, such as the similarity of the marks and whether the two companies are competitors, the weight accorded each individual factor will be case-specific. *Id.* (citing *Dreamwerks Prod. Group v. SKG Studio*, 142 F.3d 1127, 1130–32 (9th Cir. 1998)). "[T]he ultimate test is whether the public is likely to be deceived or confused by the similarity of the marks." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 780, 112 S. Ct. 2753, 2763, 120 L. Ed. 2d 615 (1992). Such similarity considers all the factors but is ultimately determined by the appearance, sound, and meaning of the marks when considered in their entirety as they appear in the marketplace. *Brookfield Commc'ns*, 174 F.3d at 1054. Here, all eight factors indicate support the finding of a likelihood of confusion.

MEMORANDUM OF POINT AND AUTHORITIES ISO TRO, ETC.

53307388.7

### (i)     Similarity of the Marks.

Defendants are using identical marks.   Down to the script, color, and placement of the marks on the bottles, there is exacting similarity between Defendants' counterfeit marks and the genuine GELISH marks.   This most important of factors therefore weighs heavily in favor of Plaintiffs.

### (ii)     Similarity of Products.

In competition with Plaintiffs, Defendants are selling gel polish foundation and top coat.   There is 100% relatedness between the goods.   To an ordinary observer, the goods are the same.   Therefore, this factor also favors Plaintiffs.

### (iii)     Strength of GELISH marks.

The spectrum of protectability and strength for trademarks is divided into five primary types of designations: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; and (5) fanciful. *See Two Pesos*, 505 U.S. at 768.   Arbitrary or fanciful marks are the strongest.   Moreover, arbitrary, fanciful and suggestive marks are deemed inherently distinctive and entitled to a high level of protection. *See id.*   To assess the relative strength of a trademark, one must consider the two aspects of strength—conceptual strength, or the mark's place on the spectrum of distinctiveness, and commercial strength, or its level of recognition in the marketplace. *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1149 (9th Cir. 2011) (internal citations omitted).

The GELISH marks are classified among the strongest marks because they are comprised of a fanciful, coined term.   Further, because of the extensive use by Harmony, the GELISH marks have come to be highly associated by consumers as an indicator of source and quality.   Accordingly, the GELISH marks are strong, and this favor heavily supports Plaintiffs' request for injunctive relief as well.

MEMORANDUM OF POINT AND AUTHORITIES ISO TRO, ETC.
53307388.7

### (iv)    Manner of Marketing.

The markets are identical.  Defendants are targeting consumers of GELISH brand products with counterfeits.  Thus this factor weighs in favor of Plaintiffs.

### (v)    Type of Goods and Degree of Care.

When reviewing this factor, the most important fact is generally price.  The greater the price of a product, the more careful the typical potential purchaser is expected to be, thereby reducing the likelihood of confusion.  *Official Airline Guides, Inc. v. Goss,* 6 F.3d 1385, 1393 (9th Cir. 1993) (stating confusion was unlikely among advertisers when the products in question cost from $2,400 to $16,000); *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1293 (9th Cir. 1992) ("consumers tend to exercise less care when purchasing lower cost items like wine and cheese, and thus rely more on brand names").  Here, the goods (gel polish foundation and top coat) are relatively inexpensive items.  Accordingly, consumers will generally exercise a low degree of care and rely more on the brand name in purchasing product.  Therefore, this factor weighs in favor of Plaintiffs.

### (vi)    Bad Faith Intent.

Defendants' counterfeiting creates a presumption of bad faith.  It has long been established that if an infringer "adopts his designation with the intent of deriving benefit from the reputation of the trade-mark or trade name, its intent may be sufficient to justify the inference that there are confusing similarities." *Pacific Telesis v. International Telesis Comms.*, 994 F.2d 1364, 1369 (9th Cir.1993) (quoting Restatement of Torts, § 729, Cmt. (b) (1938)).  An inference of confusion may be found when a mark is adopted with the intent to deceive the public.  *See Gallo*, 967 F.2d at 1293 (citing *Sleekcraft*, 599 F.2d at 354).  In a case of clear-cut copying, it is appropriate to presume that Defendants intended to cause confusion and benefit from Plaintiffs' reputation, to the detriment of Plaintiffs.

---

MEMORANDUM OF POINT AND AUTHORITIES ISO TRO, ETC.
53307388.7

Here, whether Defendants are involved in the manufacturing and/or distribution of the counterfeit product, there is evidence of bad faith. While the Counterfeit product copies major elements of Plaintiffs' trademarks and trade dress, there are noticeable differences in the bottles and a clear difference in product performance. Tingler Decl. ¶ 25. Moreover, Defendants' knowledge that they are selling counterfeit product can be inferred from the deep discounted prices at which Plaintiffs and other consumers were and still are able to purchase the product. *Id.* ¶ 29. Similarly, Defendants' clandestine behavior of secreting GELISH brand goods and counterfeit product behind the counter, so that customers cannot inspect them without Defendants' prior approval, evidences Defendants' bad faith. Phan Decl. ¶ 4, Ex. 1 (J. Phan describes how counterfeit product is secured behind a counter and not available for inspection unless provided by an employee at least at V & V Beauty and A B C Nail). Defendants' awareness of the infringing nature of the counterfeit product creates a presumption of deception. *See Gallo*, 967 F.2d at 1293 (*citing Sleekcraft*, 599 F.2d at 354). Thus this factor also favors Plaintiffs.

### (vii)   Actual Confusion.

Actual confusion is unnecessary to establish infringement since the test is likelihood of confusion. *Brookfield Commc'ns, Inc.*, 174 F.3d at 1050 ("failure to prove instances of actual confusion is not dispositive against a trademark plaintiff, because actual confusion is hard to prove; difficulties in gathering evidence of actual confusion make its absence generally unnoteworthy"); *see also Sleekcraft*, 599 F.2d at 353 ("Because of the difficulty in garnering . . . evidence [of actual confusion], the failure to prove instances of actual confusion is not dispositive."). In this case, however, actual confusion exists in the marketplace. Harmony has received multiple complaints about the poor quality of the GELISH product from customers seeking a refund. *See* Tingler Decl. ¶ 25; Supp. Tingler Decl. ¶ 15. Hence, this factor also weighs heavily in favor of Plaintiffs.

MEMORANDUM OF POINT AND AUTHORITIES ISO TRO, ETC.
53307388.7

**(viii)  Likelihood of Expansion.**

"Inasmuch as a trademark owner is afforded greater protection against competing goods, a 'strong possibility' that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing. When goods are closely related, any expansion is likely to result in direct competition." *Sleekcraft,* 599 F.2d at 354 (citations omitted).  Where, as here, the parties are already in direct competition, this factor is unnecessary. *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1153 (9th Cir. 2011).  Its underlying rationale already weighs in favor of Plaintiffs.

In view of the foregoing, it is clear that all eight factors weigh overwhelmingly in Plaintiffs' favor.  Plaintiffs have, therefore, shown a probability of success on the merits in establishing a likelihood of confusion as required by 15 U.S.C. § 1114(a), (c).  As a result, Defendants should be required to show cause why a preliminary injunction should not issue.

**B.    Plaintiffs Are Suffering A Likelihood of Irreparable Injury.**

"Likely irreparable harm must be demonstrated to obtain a preliminary injuction . . . ." *Herb Reed,* 736 F. 3d at 1249.  To this end, "Courts have recognized that, in trademark cases, the injury caused by the infringement manifests as the loss of control over a business' reputation, a loss of trade and loss of goodwill." *E. & J. Gallo Winery v. Grenade Bev. LLC*, 2014 WL 4073241, at *14 (E.D. Cal. Aug. 15, 2014) (citing *CytoSport, Inc. v. Vital Pharmaceuticals, Inc.*, 617 F. Supp. 2d 1051, 1080 (E.D. Cal. 2009)).

In counterfeit cases, where defendants have usurped the mark of another to deceive consumers into buying their product or service, a finding of likely irreparable harm is unavoidable.[9]  "Trademarks serve as the identity of their owners

---

[9]  *See* Sirdesai Decl. ¶ 4 ("counterfeit nail products (a) do not duplicate the formulas of leading brands; (b) there are no assurances that they are subject to the same quality controls; and (c) whether a particular batch of counterfeit goods is of

MEMORANDUM OF POINT AND AUTHORITIES ISO TRO, ETC.
53307388.7

and in them resides the reputation and goodwill of their owners. Thus, if another person infringes the marks, that person borrows the owner's reputation, whose quality no longer lies within the owner's control. A trademark owner's loss of the ability to control its mark, thus, creates the potential for damage to its reputation." *CytoSport, Inc.*, 617 F. Supp. 2d at 1080; *accord Seed Services, Inc. v. Winsor Grain, Inc.*, 868 F. Supp. 2d 998, 1005 (E.D. Cal. 2012); *Fiji Water Co., LLC v. Fiji Mineral Water USA, LLC*, 741 F. Supp. 2d 1165, 1182-83 (C.D. Cal. 2010); *Maxim Integrated Products, Inc. v. Quintana*, 654 F. Supp. 2d 1024, 1035-36 (N.D. Cal. 2009); *QS Wholesale, Inc. v. Rox Volleyball, Inc.*, 2015 U.S. Dist. LEXIS 95767, at *23 (C.D. Cal. Jul. 19, 2015).

Irreparable harm in the context of counterfeit products was discussed in the case of *Starbucks Corp. v. Heller*, 2014 WL 6685662, at *4 (C.D. Cal. Nov. 26, 2014). In *Starbucks*, the Court found that the counterfeit marks used by Defendants caused irreparable harm to Starbucks. Among other things, Defendants' unlawful use of the Starbucks marks "risks a negative connotation among Starbucks consumers who purchase counterfeit product or observe counterfeit product being sold in a setting typically prohibited by Starbucks." *Id.* Moreover, Defendants' unlawful use of the Starbucks Marks "deprives Starbucks of the ability to exercise quality control, which Starbucks expends substantial resources to enforce." *Id.* "Loss of control, loss of goodwill, and damages to Starbucks Corporation's reputation cannot be quantified. Money damages are insufficient to compensate Starbucks for Defendants' unlawful misconduct." *Id.* The "Starbucks Corporation's products are placed at a competitive disadvantage when they compete against counterfeit products bearing the Starbucks Marks." *Id.*

Irreparable harm was also found in the counterfeit case of *Chanel, Inc. v. Puka Creations, et al.*, Case No. 14-cv-08405-ODQ (C.D. Cal. Nov. 3, 2014). The low or high quality is immaterial, as the brand owner has no control over the quality of the product or use of its trademark.").

MEMORANDUM OF POINT AND AUTHORITIES ISO TRO, ETC.

53307388.7

Court granted an injunction and found irreparable harm because of Chanel's loss of control of its trademark. There was a danger "that the public will mistakenly assume there is an association between the producers of the related goods, though no such association exists." *Id.* (citing *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.,* 638 F. 3d 1137, 1150 (9th Cir. 2011)). Although there was no evidence of actual confusion, it was not necessary. The Court found that "an average consumer down the distribution line may be unable to detect the counterfeit nature of the goods." *Id.* Because the defendants had misappropriated Chanel's trademark, "the risk of harm to Chanel's goodwill and reputation satisfies the requirement of a likelihood of irreparable harm if a TRO does not issue." *Id.*

Irreparable harm supportive of a preliminary injunction was also found in the case of *American Bullion, Inc. v. Regal Assets, LLC,* 2014 WL 7404597 (C.D. Cal. Dec. 30, 2014). The Court found irreparable harm after evidence was presented of lost sales and evidence that there were consumers confused by Defendant's website advertising. *Id.* at *2. The Court considered the ongoing nature of the false and misleading advertising in granting the preliminary injunction. *Id.* In counterfeit cases, the defendants are necessarily engaged in false advertising as well.

As in the aforementioned cases, it is clear that Defendants' proliferation of cheap, low-quality counterfeit products, not only eviscerates Plaintiffs' ability to control its mark, but grossly impacts Plaintiffs' reputation and goodwill, resulting in a likelihood of irreparable harm. Indeed, the widespread proliferation of counterfeit products imported from China in no less than seven reported states (California, Nevada, Nebraska, Missouri, South Carolina, Florida and Texas), which has largely contributed to a substantial and unexpected first quarter loss of sales, manifestly evidences the "loss of control over business reputation," which is the very function of a trademark. *See Herb Reed*, 736 F.3d at 1249; *Fitspot Ventures v. Bier,* 2015 WL 5145513, at *4 (C.D. Cal. Sep. 1, 2015). Had Plaintiffs

MEMORANDUM OF POINT AND AUTHORITIES ISO TRO, ETC.

53307388.7

granted a naked license to Defendants to use the GELISH brand to promote their counterfeit product from China, Plaintiffs would have *lost* their trademark and have *no trademark rights or protection. FreecycleSunnyvale v. Freecycle Network,* 626 F. 3d 509, 519 (9th Cir. 2010).   At this point, injunctive relief is the *only way* Plaintiffs can control their business reputation and use of their trademark.   An after-the-fact award of damages is <u>not</u> an adequate remedy as it would abdicate control over the mark pending trial, and fail to remedy the loss of customers and goodwill and business reputation resulting from the unauthorized use of their mark.

Plaintiffs have proffered direct evidence of damage to their goodwill in the form of customer complaints about the cheap, low-quality nature of the counterfeit product, which is further evidence of irreparable harm.  *Herb Reed,* 736 F.3d at 1249; *Starbucks Corp.,* 2014 WL 6685662, at *4.  While there is no requirement of proof of actual confusion from customer complaints to warrant an injunction, particularly where time is off the essence to prevent irreparable harm from occurring (*Chanel, Inc.,* Case No. 14-cv-08405-ODQ), and where the product is mislabeled and poses a health risk to consumer (*Kerr Corp. v. Tri Dental, Inc.,* 2013 WL 990532, at *8 (C.D. Cal. Mar. 11, 2013)), there have now been multiple complaints of the cheap, low-quality counterfeit product, which has a foul gasoline, burnt plastic smell (Supp. Tingler Decl. ¶¶ 11, 15) and which is typical for nail products imported from China (Sirdesai Decl. ¶ 7).  Actually confused consumers have complained to nail technicians or salon owners that the "GELISH" product applied to their nails was "brittle," "fall off" or "cracked" within days, ruining their nails, and in one instance caused "burning" due to a reaction to the mislabeled product, harming the customer.  Tingler Decl. ¶ 25; Supp. Tingler Decl. ¶ 15.

Plaintiffs have demonstrated that such customer complaints are extremely detrimental to their goodwill and reputation as a manufacturer of high-quality gel polish, foundation, and top coat that are actually made in the USA and do not have

53307388.7

the harmful ingredients found in nail products imported from China.  *See* Tingler Decl. ¶¶ 2-40; Supp. Tingler Decl. ¶¶ 11-16; Sirdesai Decl. ¶¶ 4-8 & Ex. 2 (Sweden banning product from China).  Indeed, even absent consumer complaints (which Plaintiffs continue to receive), Plaintiffs are necessarily exposed to a substantial risk of irreparable harm due to the inferior nature of the counterfeit product as compared to authentic GELISH brand product, which has won multiple awards for *Product of the Year*.  *Ibid.*  The nail products industry is highly competitive and, while it takes years to develop a strong reputation and goodwill in a product line, not to mention brand loyalty, demand for a product can quickly dissipate, especially when there is a product recall or repeated complaints about product quality or inferior performance, which stifles business.  Supp. Tingler Decl. ¶ 14.

Plaintiffs are also suffering irreparable harm to their distributor relationships, which drive the nail products industry.  Independent distributors have access to multiple brands and negotiate exclusive relationships and territories.  Manufactures compete for the patronage of these distributors.  Counterfeiting activity threatens and harms a manufacturer's business relationships with such distributors as it reduces and diminishes the value of a brand.  *Id.* ¶¶ 12-14; Tingler Decl. ¶ 38.  Accordingly, there is substantial evidence of irreparable harm, on multiple grounds, warranting the immediate entry of a TRO and issuance of an OSC re: preliminary injunction to prevent the subject counterfeiting activity.

## C.  **The Injury to Plaintiffs Outweighs Potential Harm to Defendants**.

Plaintiffs have demonstrated that the irreparable injury to them is substantial, plainly outweighing any potential harm to Defendants.  *See Stuhlbarg Int'l Sales Co.*, 240 F.3d at 841 (balance of equities favors injunction because evidence of loss of prospective customers or goodwill definitely supports the requisite finding).  Any inconvenience to Defendants will be merely economic, consisting of the loss

53307388.7

of ill-gotten gains from the sales of counterfeit products.  The potential for any other type of harm, moreover, is ameliorated by the posting of a bond by Plaintiffs.

**D.    The Public Interest Is Best Served By Enjoining Defendants' Counterfeiting.**

One of the essential purposes of the Lanham Act is to protect the consuming public from being misled as to the source of goods. *Sega Enterprises Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1530 (9th Cir. 1992), *as amended* (Jan. 6, 1993). Moreover, enjoining conduct expressly proscribed by a federal statute is undoubtedly in the public interest. *See* 15 U.S.C. § 1116.

Here, potentially tens of thousands of consumers in this Judicial District and around the country will be deceived, defrauded, confused and potentially even exposed to hazardous materials by Defendants' activities.  Accordingly, the public interest is served by enjoining Defendants' counterfeiting, as well as seizing counterfeit goods before they would otherwise enter the stream of commerce.

**IV.    A MULTI-DISTRICT OR EXTRATERRITORIAL INJUNCTION IS NECESSARY AND PROPER.**

**A.    Consumers and Plaintiffs Are Entitled To Broad Injunctive Relief to Protect Against Continued Counterfeiting.**

A TRO and preliminary injunction are specifically authorized "anywhere in the United States where [Defendants] may be found."  15 U.S.C. § 1116(a). Further, such orders bind not only the named parties, but also those in active concert or participation with them who receive actual or other notice of the orders, *even if beyond the territorial limits of the district court enjoining said activity.* F.R.C.P. Rule 65(d)(2) ("The order binds only the following who receive actual notice of it by personal service or otherwise: (A) the parties; (B) the parties' officers, agents, servants, employees, and attorneys; and (C) *other persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or*

MEMORANDUM OF POINT AND AUTHORITIES ISO TRO, ETC.

53307388.7

*(B)'')* (emphasis ours).  The Court's authority in this regard is well settled.  *See Regal Knitwear Co. v. National Labor Relations Board,* 324 U.S. 9, 14 (1945) (Rule 65(d) "is derived from the common law doctrine that a decree of injunction not only binds the parties defendant but also those identified with them in interest, in 'privity' with them, represented by them or subject to their control. In essence it is that defendants may not nullify a decree by carrying out prohibited acts through aiders and abettors, though they were not parties to the original proceeding"); *Mattel, Inc. v. MCA Records, Inc.,* 296 F.3d 894, 899 (9th Cir. 2002) (holding that worldwide sales of album had sufficient effect on American foreign commerce to apply Lanham Act extraterritorially where plaintiff "suffered monetary injury in the United States from those sales"); *Ocean Garden v. Marktrade Co. Inc.,* 953 F.2d 500, 503 (9th Cir. 1991) (district court had both extraterritorial jurisdiction over infringing goods which passed through United States foreign trade zone and properly issued injunction based on likelihood of confusion); *New Name, Inc. v. The Walt Disney Co.,* No. CV 07–5034 PA (RZx), 2008 WL 5587486, *7 (C.D. Cal. July 25, 2008) (appropriate to apply Lanham Act extraterritorially based on evidence that loss of sales occurred from infringement); *Nintendo of America v. NTDEC,* 822 F. Supp. 1462, 1466, 1468 (D. Ariz. 1993) (worldwide injunction ordering defendants to deliver up infringing goods for destruction).

The propriety of a broad injunction order has long been established by numerous courts throughout the country, as explained by the Fifth Circuit in *Waffenschmidt v. Mackay,* 763 F.2d 711 (1985):

> Non-parties who reside outside the territorial jurisdiction of a district court may be subject to the court's jurisdiction if, with actual notice of the court's order, they actively aid and abet a party in violating that order.  This is so despite the absence of other contacts with the forum. [***] Courts do not sit for the idle ceremony of making orders and pronouncing judgments, the enforcement of which may be flouted, obstructed, and violated with impunity, with no power in the tribunal to punish the offender.  [Federal] courts, equally with those of the state, are possessed of ample power to protect the administration of justice from being thus hampered or interfered with.

MEMORANDUM OF POINT AND AUTHORITIES ISO TRO, ETC.
53307388.7

*Id.* at 714, 716 (citations omitted).

In this case, without an injunction extending outside of California, for example, complete relief would be impossible to achieve. Plaintiffs would have to seek separate injunctions at every state, including in California, Texas, New York, Florida, Nevada, Missouri and South Carolina, where counterfeit product has been found. Such a series of lawsuits would result in a terrible waste of party and judicial resources, not to mention risk a patchwork of conflicting orders covering the same subject matter. Rule 65 mandates that all persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or (B) be bound by the Court's injunctive order. Such relief is necessary and proper.

**B.   Defendants Will Have A Full and Fair Opportunity To Be Heard.**

Although it is not known whether any of the Defendants will appear before the Court, and thereby voluntarily subject themselves to discovery, given the flagrantly illegal nature of their counterfeiting activity, they certainly will have that opportunity. In fact, although Plaintiffs expect having to pursue and enforce default judgments, Plaintiffs would welcome Defendants' appearances and participation in discovery as that could further assist Plaintiffs in the identification the source and scope of the subject counterfeit ring, and facilitate further and complete relief.

Defendants are being notified (directly and indirectly) that any defendant who wishes to challenge the TRO will have the opportunity to be heard and show cause why an injunction should not issue. The requested TRO properly balances the parties' respective interests, while protecting Plaintiffs' intellectual property and enabling Plaintiffs to obtain evidence of Defendants' wrongdoing.

**V.   BOND AMOUNT.**

Plaintiffs request that this Court dispense with any bond or impose a minimal bond of less than a hundred dollars ($100.00). The targeted merchandise is cheap, proven fakes. No undue harm can befall Defendants from the TRO.

53307388.7

## VI.   THE REQUESTED INJUNCTIVE RELIEF IS NECESSARY AND APPROPRIATE.

Courts are authorized under 15 U.S.C. § 1116(a) to "grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable" to prevent violations of Lanham Act. *Reebok Int'l, Ltd. v. Marnatech Enterprises, Inc.*, 970 F.2d 552, 558 (9th Cir. 1992) (15 U.S.C. §1116 indisputably authorizes injunctions to stop trademark infringement).   Consistent with the equitable protection authorized by 15 U.S.C. § 1116(a), the injunctive relief requested by Plaintiffs is necessary and appropriate to set and preserve the *status quo* and prevent irreparable harm before judgment.   *See, e.g., Textile Unlimited, Inc. v. A. BMH & Co.*, 240 F.3d 781, 786 (9th Cir. 2001); *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984). *Yash Raj Films (USA), Inc. v. Sidhu*, Case No. 09-cv-0233-AWI, 2010 WL 1032792, *7 (E.D. Cal. Mar. 18, 2010) ("Generally, public policy favors injunctive relief to remedy the infringement of intellectual property rights"); *see also Nintendo of America, Inc. v. Lewis Galoob Toys, Inc.*, 16 F.3d 1032, 1038 (9th Cir. 1994).

Plaintiffs request that this court issue the following prohibitory injunction to set and preserve the *status quo* pending further order from the Court:

> an injunction enjoining the promotion, acquisition, sales, returns, shipping and disposal of all counterfeit GELISH brand products, including Foundation and Top it Off, and requiring the preservation of all evidence related to the promotion, acquisition, inventory, sales, returns, shipping, handling and disposal of all GELISH products, including but not limited to counterfeit GELISH brand foundation and top coat.

Such injunctive relief is both necessary and appropriate to stop the counterfeiting activity, preserve the *status quo* and prevent irreparable loss of rights before judgment, particularly given the underground nature of the counterfeiting activity, the ease of transporting and disposing of small bottles of counterfeit product, and prior subterfuge.   *See* Tingler Decl. ¶¶ 18-20, Exs. 1-3; Phan Decl.

MEMORANDUM OF POINT AND AUTHORITIES ISO TRO, ETC.

53307388.7

¶¶ 4, 11.   In addition, Plaintiffs request a mandatory injunction to preserve the *status quo* and prevent evasion and further irreparable harm in the nature of the likely destruction of evidence and refusal to cooperate in this proceeding:

> an injunction requiring Defendants within five days of service of the order to turn over to Plaintiffs all counterfeit GELISH brand products and all documents, including electronic records, related to the promotion, acquisition, inventory, sales, returns, shipping, handling and disposal in the last year of all GELISH products, including all counterfeit GELISH products, in their possession, custody or control;

Injunctive relief is treated as a mandatory injunction when it "orders a responsible party to 'take action.'" *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH &Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (citation omitted).   The Ninth Circuit cautions that a mandatory injunction should not issue in "doubtful cases" but only when "'the facts and law clearly favor the moving party.'" *Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150, 1160 (9th Cir. 2011); *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994) (quoting *Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir.1979).

This is not a doubtful case.   Plaintiffs' ongoing investigation, evidenced by declarations, exhibits, and accompanying documents, presents a clear record of illegal counterfeit activities by perpetrators identified in seven different states, receiving the same nail products with the same fake labeling from the same source. As attested to by Plaintiffs' private investigator, Jim Phan, based on his years of law enforcement experience and knowledge of this industry, evidence of the counterfeiting activity will be hard to obtain absent such injunctive relief, which is corroborated by Plaintiffs' prior litigation experience.   Malynn Decl. ¶ 5.

## VII.   PLAINTIFFS SHOULD BE ALLOWED TO ENGAGE IN EXPEDITED DISCOVERY.

There is also good cause to order expedited discovery.   In the Ninth Circuit, courts use the "good cause" standard to determine whether discovery should be

MEMORANDUM OF POINT AND AUTHORITIES ISO TRO, ETC.
53307388.7

allowed to proceed prior to a Rule 26(f) conference.  *UMG Recordings, Inc. v. Doe,* 2008 WL 4104214, at *4 (N.D. Cal. 2008).  Good cause may be found where the need for expedited discovery, in consideration of the administration of justice, outweighs the prejudice to the responding party.  *In Re Countrywide Fin. Corp Derivative Litig.,* 542 F. Supp. 2d 1160, 1179 (C.D. Cal. Mar. 28, 2008).  There is good cause to expedite discovery in this case, so as to aid and enable Plaintiffs to present this Court with a full record regarding both the nature and scope of the counterfeiting activity, including the involvement of each named defendant and other persons and entities conspiring to counterfeit GELISH brand goods.  Malynn Decl. ¶ 6.  Such discovery will also assist, not only on the merits of the case at the preliminary injunction hearing, but also help the Court determine whether it has personal jurisdiction over all the defendants.  *Id.*  Specifically, Plaintiffs request that this Court allow Plaintiffs to immediately conduct depositions of Defendants pursuant to Fed. R. Civ. P. 30, and to immediately propound ten (10) Requests for Production of Documents with a command that verified responses and document production be produced and completed within five (5) days.  Accelerated discovery will not unduly prejudice Defendants and will serve the interests of justice in assuring that counterfeit goods are not left on the marketplace.

**VIII.  CONCLUSION**.

In view of the foregoing, Plaintiffs respectfully request this Court grant the following on an emergency, *ex parte* basis: (a) a temporary restraining order; (b) an order to show cause why a preliminary injunction should not issue; and (c) an order authorizing expedited discovery.

Date:  June 8, 2016                                      Respectfully submitted,

                                                                   **POLSINELLI LLP**

                                                                   By:   Todd M. Malynn, Esq.
                                                                          *Attorneys for Plaintiffs*

24

MEMORANDUM OF POINT AND AUTHORITIES ISO TRO, ETC.

53307388.7